# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **KATHLEEN MURPHY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| vs. ) | Case No. CIV-10-930-F |
| ) | |
| **MICHAEL J. ASTRUE, Commissioner,** ) | |
| **Social Security Administration,** ) | |
| ) | |
| **Defendant.** ) | |

## REPORT AND RECOMMENDATION

Kathleen Murphy ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405 (g) seeking judicial review of Defendant Commissioner's final decision denying Plaintiff's application for disability insurance benefits under the Social Security Act. This matter has been referred to the undersigned Magistrate Judge for proceedings consistent with 28 U.S.C. § 636(b)(1)(B). Upon review of the pleadings, the record ("Tr.") and the parties' briefs, the undersigned recommends that the Commissioner's decision be affirmed.

## Administrative Proceedings

Plaintiff initiated these proceedings by filing her application seeking disability insurance benefits in March, 2007 [Tr. 128 - 130].[1] As a result of "C1esterate inhibitor

---

[1]The record also contains Plaintiff's application seeking supplemental security income ("SSI") payments[128 - 130]; no subsequent reference is made to this application in the record but Plaintiff mentions the SSI application in her brief [Doc. No. 17, p. 5]. In his response brief, the Commissioner states that Plaintiff's SSI claim was denied on March 15, 2007, "because Plaintiff's husband's monthly wages exceeded the household income limitations for SSI eligibility. Thus, contrary to Plaintiff's assertion, the ALJ's decision and

deficiency; vascular disease/Renodes Disease possible; severe arthritis; back problems - degenerative disc; osteoporosis in back; hard to walk due to past surgery; low vision[,]" Plaintiff alleged that "my hands and toes are turning black and swell. I have difficult time writing because my fingertips are numb. I have unbearable pain. It is hard to do things because I was told to wear gloves to keep my hands warm. I can hardly do dishes or zip up my pants. I must wear tennis shoes becasue of my feet. I can't wear any other types of shoes. My knees feel like they are about to give out."[2] [Tr. 163]. She alleged that her condition became disabling as of September 1, 2006 [Tr. 128 and 163]. Plaintiff's claim was denied and, at her request, an Administrative Law Judge ("ALJ") conducted a January, 2009 hearing where Plaintiff, who was represented by counsel, a medical expert, and a vocational expert testified [Tr. 29 - 77]. In her June, 2009 decision, the ALJ found that Plaintiff retained the capacity to perform available work and, accordingly, was not disabled within the meaning of the Social Security Act [Tr. 18 - 28]. The Appeals Council of the Social Security Administration declined Plaintiff's request for review [Tr. 2 - 6], and Plaintiff subsequently sought review of the Commissioner's final decision in this court.

---

Plaintiff's appeal before this Court addresses only Plaintiff's [disability insurance benefits] claim." [Doc. No. 17, p. 1, n. 1]. Plaintiff did not exercise her option to counter this or any other contention by the Commissioner through a reply brief [ Doc. No. 10]. Because no additional reference was made to the SSI claim in the record, this report addresses only Plaintiff's claim for disability insurance benefits.

[2]Unless otherwise indicated, quotations in this report are reproduced verbatim.

**Standard of Review**

This court is limited in its review of the Commissioner's final decision to a determination of whether the Commissioner's factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citations and quotations omitted). Nonetheless, while this court can neither reweigh the evidence nor substitute its own judgment for that of the Commissioner, the court's review is not superficial. "To find that the [Commissioner's] decision is supported by substantial evidence, there must be sufficient relevant evidence in the record that a reasonable person might deem adequate to support the ultimate conclusion." *Bernal v. Bowen,* 851 F.2d 297, 299 (10th Cir. 1988) (citation omitted). "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Id.* at 299.

**Determination of Disability**

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.§§423(d)(1)(A). The Commissioner applies a five-step inquiry to determine whether a claimant is disabled. *See* 20 C.F.R. §404.1520(b)-(f); *see also Williams v. Bowen*, 844 F.2d 748, 750-752 (10th Cir. 1988) (describing five steps in detail). Under this sequential procedure, Plaintiff bears the initial burden of proving that she has one or more severe impairments. 20 C.F.R. § 404.1512;

*Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985). Then, if Plaintiff makes a prima facie showing that she can no longer engage in prior work activity, the burden of proof shifts to the Commissioner to show that Plaintiff retains the capacity to perform a different type of work and that such a specific type of job exists in the national economy. *Turner*, 754 F.2d at 328; *Channel v. Heckler,* 747 F.2d 577, 579 (10th Cir. 1984).

**Plaintiff's Claims of Error**

In the first of her five claims of error on judicial review, Plaintiff argues that "[t]he ALJ's finding that [Plaintiff] is not credible is not supported by substantial evidence and does not comport with the standards required by SSR 96-7p and 20 C.F.R. §§ 404.1529 and 416.929." [Doc. No. 16, p. 12]. Next, it is Plaintiff's contention that "[t]he ALJ failed to follow the mandate of SSR 96-8p and 20 C.F.R. §§ 404.1545 and 416.945 when determining the RFC[3] for [Plaintiff]." *Id.* at 15. Plaintiff's third claim is that "[t]he ALJ failed to apply the factors set out in *Trimiar v. Sullivan,* 966 F.2d 1326, 1330 (10th Cir. (Okla.) 1992) with respect to whether or not there was significant available jobs at step 5 of the sequential evaluation process." *Id.* at 19. The fourth claimed error is that "[t]he ALJ failed to take into account the Plaintiff's obesity when assessing his residual functional capacity to perform sedentary work pursuant to Social Security Ruling 02-01p." *Id.* Finally, Plaintiff maintains that "[t]he ALJ failed to conduct the 'accurate accounting' mandated by SSR 96-9p after finding that [Plaintiff] was limited to less than sedentary work." *Id.* at 21.

---

[3]Residual functional capacity ("RFC") "is the most [a claimant] can still do despite [a claimant's] limitations." 20 C.F.R. § 404.1545(a)(1).

## Analysis

### Credibility

The ALJ found that Plaintiff – who was forty-seven years old on December 31, 2007, the day she was last insured for disability benefits,[4] [Tr. 20 and 27] – was severely impaired by C-1 sterase inhibitor deficiency,[5] Raynaud's syndrome,[6] and degenerative disc disease of

---

[4]As the Commissioner maintains, "[b]ecause Plaintiff's insured status expired on December 31, 2007, she had to establish disability on or before that date to be eligible for benefits under Title II (Tr. 159) . . . [and] the relevant period is from September 1, 2006, Plaintiff's alleged disability onset date, through December 31, 2007[.]" [Doc. No. 17, p. 1, n.1].

[5]Dr. Epstein, the medical expert who testified at Plaintiff's administrative hearing, explained this impairment in the following manner:

> In reviewing [Plaintiff's] records I identified several, several medical problems, one of which is an uncommon, or perhaps rare, condition that causes recurrent angioedema. And, and the name of this condition is C1 esterase inhibitor efficiency. . . . Characteristically, the episodes of, of angioedema are swelling occur in, in three areas, or they can occur in three areas. One is the skin, where there can be localized swelling in the area of the skin. Another area is the abdomen. And this would be the abdominal contents, the intra-abdominal problems. And the swelling can be a source of pain and can mimic various abdominal problems such as appendicitis or gall bladder trouble or whatever. And then the last area, which is potentially the most serious is that it can involve the, the larynx and can swelling in the larynx can be life-threatening. And there can be obstruction of the, of the airway. Now, in, in the, records, the exhibits that I reviewed I found medical visits where, where she was seen with involvement of the skin. I did not find any where there was, where there was involvement of the abdomen or larynx. The, the in the record that this diagnosis is referred to, although I, I did not find the confirmatory laboratory data of which may have been done earlier than our records reflect.

[Tr. 39 - 40].

[6]Raynaud's syndrome was also described by the Medical Expert:

the cervical spine [Tr. 20]. The ALJ further concluded that none of Plaintiff's severe impairments met or equaled listing-level severity [Tr. 23] and, following a review of the medical evidence of record, stated that

> [a]fter careful consideration of the entire record, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she: only can lift and/or carry, and push and/or pull, up to ten pounds of weight; only can stand and/or walk for up to 4 hours in an 8-hour work day; only can sit for up to 4 hours in an 8-hour work day; only occasionally can use her hands to reach, handle, finger, and feel; cannot climb ladders; cannot be exposed to temperature extremes, especially cold; and cannot use equipment that causes hand vibrations.

[Tr. 24, bolding omitted].

The ALJ's decision reflects her consideration of Plaintiff's subjective complaints, or symptoms, in conjunction with the foregoing RFC evaluation through her finding "that clainmant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent

---

> A second problem is Raynaud's syndrome, R-A-Y-N-A-U-A-D-S. And this is a hyper reactivity of the blood vessels, particularly the arteries in the, and it's usually in the fingers and hands and in the feet. And commonly occurs on exposure to cold, although it can also be related to further, further, triggers. And the symptoms there are usually color of the skin of the fingers or toes. Sometimes a blueness. And even in an extreme situation, there can be ulcerations at the tips of the fingers and toes. Raynaud's phenomenon occurs in a number of different circumstances. The most common of which is cigarette smoking. It can also occur with various medical conditions.

[Tr. 40].

with the above residual functional capacity assessment." [Tr. 24 - 25]. Thus, the ALJ, as required, considered Plaintiff's allegations of disabling symptoms in order to "decide whether [s]he believe[d them]." *Thompson v. Sullivan,* 987 F.2d 1482, 1489 (10th Cir. 1993) (quotation omitted). In making this determination, an ALJ should consider factors such as

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

*Hargis v. Sullivan,* 945 F.2d 1482, 1489 (10th Cir. 1991) (quotation omitted).

Here, in concluding that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [her] symptoms are not credible," [Tr. 24 - 25], the ALJ provided the following explanation for that assessment after a detailed review of the objective medical evidence[7] of record:

---

[7]In detailing the results of Plaintiff's encounters with various medical providers during the time period pertinent to her claim, the ALJ noted with particularity the absence of evidentiary support for Plaintiff's alleged September 1, 2006, onset of disability date:

> Robert M. Love, M.D. treated the claimant for various conditions from 1998 through October 2003, long before the alleged disability onset date. He did examine her on March 1, 2007, five months after her alleged onset date. On that date, [Plaintiff] complained of losing circulation in her hands and feet (Exhibit 4F). Upon examination, Dr. Love reported her results were all normal, except for some malaise and myalgia (Exhibit 4F, p. 5). Blood tests revealed negative results for the rheumatoid arthritis factor and the antinuclear antibodies factor (Exhibit 4F, p. 6). [Plaintiff] had a slightly positive result in her erythrocyte sedimentation rate, an indicator of inflammation (Exhibit 4F, p. 4). Subsequent testing for antinuclear antibodies revealed normal results on all tests (Exhibit 9F, pp. 5-7). Nothing in his records support the claimant's

7

allegation that she became disabled on September 1, 2006, the alleged onset date of disability, as she did not even see Dr. Love from October 2003 until March 1, 2007. In addition, testing performed in March 2007 did not reveal any significant problems.

The claimant next visited Richard T. Brittingham, M.D. on March 22, 2007, seeking a new treating physician, more than six months after her alleged onset date of disability. A thorough review of these records reveals they do not tie her impairments to the alleged onset date. Since her first visit, Dr. Brittinham has diagnosed her with Raynaud's syndrome, angio edema, and C-1 sterase deficiency (Exhibit 9F, p. 38). On her initial visit, on one form she reported she has "a problem in my hands & feet" and that the problems began on January 23, 2007, when she went to the emergency room (Exhibit 9F, pp. 39, 46). She also reported a history of back pain. On another form completed on March 22, 2007, while she reported fatigue and constipation were chronic, she noted the pain in her hands and feet had just begun in January 2007 (Exhibit 9F, p. 38). On April 24, 2007, she reported the pain in her hands and feet began in January 2007 (Exhibit 9F, p. 25). She also wrote that weakness in her hands began in January 2007, and that she experienced extreme pain in her hands, changes in color of the hands to white, then to a bluish/black shade, as well as numbness in her fingers (Exhibit 9F, p. 25). On May 22, 2007, the claimant reported the pain in her hands began on January 23, 2007, but that the pain in her feet had been chronic (Exhibit 9F, p. 22). These reports are inconsistent, and do not connect the Raynaud's syndrome, C-1 sterase inhibitor deficiency, or degenerative disease of the cervical spine to her alleged disability onset date of September 1, 2006.

* * *

The claimant also had bone density testing performed on May 8, 2007, and the results were compared to findings from 2003. The tests revealed mild osteopenia, unchanged from the 2003 results (Exhibit 9F, p. 18). On May 22, 2007, the claimant informed Dr. Brittingham that by the middle of the day, she cannot walk (Exhibit 9F, p. 22). On March 28, 2008, though, she reported to a different doctor that her hand, foot, and hip pain is worse in the morning and gets better throughout the day (Exhibit 13F, p. 14). On June 26, 2007, when the claimant next visited Dr. Brittingham, she reported excruciating pain in her back, but on June 5, 2007 and July 3, 2007, she noted back pain was not a current symptom (Exhibit 9F, pp. 11, 13, 16). June 2007 testing was negative

At the hearing on January 21, 2009, the claimant testified that the Raynaud's

> for rheumatoid arthritis factor (Exhibit 9F, p. 12). The claimant continued her visits with Dr. Brittingham through September 2007, a year after her alleged disability onset date. All test results continued to be negative or within normal limits (Exhibit 15F, pp. 8 - 11).
>
> * * *
>
> The claimant also submitted records from OU Medical Center dated from February 27, 2008 through July 3, 2008 (Exhibit 13F, 16F, 17F). Despite the fact that these records do not begin until one and one-half years after the alleged onset date of disability, the Administrative Law Judge thoroughly reviewed these records to determine if any notes refer back to any incident, injury, or other factor that caused [Plaintiff] to select September 1, 2006 as the alleged disability onset date. The records contain results from tests performed because of her hand, foot, and back pain, and because of blood in the claimant's urine. Most results were negative or within normal limits, including negative results for rheumatoid arthritis, systemic lupus erythematosus, and anti-cyclic citrullinated peptide, a rheumatoid arthritis indicator (Exhibit 13F, pp. 2, 15-28).
>
> On July 3, 2008, Linda Kay McMurphy examined the claimant and tested her grip strength. Dr. McMurphry reported her hand grip strength was 5/5 in one hand, and 4/5 in the other hand, indicating claimant can use her fingers and hands to perform sedentary work (Exhibit 13F, p. 2). The doctor also noted the claimant was non-compliant with medical advice to take a supplement and stop smoking (Exhibit 13F, p. 2). Notes from April 28, 2008 indicate [Plaintiff] went to the hospital for a problem and was advised to follow up with her treating doctors at OU Medical Center, and that she failed to do so (Exhibit 13F, p. 9). Notes from April 24, 2008 state results from X-rays of her hands, feet, and lumbar spine were all within normal limits, confirmed by the test results in the record (Exhibit 13F, pp. 11, 15-16). On October 2, 2008, claimant reported she had stopped taking Procardia for her Raynaud's syndrome, so she again was non-compliant with her medication regiment (Exhibit 17F, p. 3). An examination revealed no tenderness of the lumbar or cervical spine (Exhibit 17F, p. 3).

[Tr. 21 - 23].

syndrome attacks cause her hands to change color and cause her to experience pain that feels like a burning sensation. She testified this happens once or twice per day and lasts for one hour. The medical expert, Dr. Eppstein, testified the medical evidence does not show such a frequency of problems. [Plaintiff] stated she cannot chop food or type on a computer because her fingers are numb all the time, yet the consultative examiner found all hand and finger test results to be normal or within normal limits. [Plaintiff] also stated she cannot walk much because of foot spasms, which she stated get worse throughout the day. She indicated this is the same pain progression in her hands, that the pain gets worse as the day goes on. These statements directly contradict what she told a treating physician approximately ten months earlier, when she stated her hand, foot, and hip pain decrease during the day and that the pain is at its worst in the morning (Exhibit 13F, p. 22).[8] The claimant has also admitted being non-compliant with medical advice. [Plaintiff's] discontinuation of her Procardia, which she reported taking for her Raynaud's syndrome, casts doubt upon her credibility.

[Tr. 24].

In urging that the ALJ's credibility assessment suffers from the lack of both evidentiary and legal support, Plaintiff first takes issue with the ALJ's finding regarding Plaintiff's decision to stop taking Procardia, claiming that the ALJ failed to consider Plaintiff's inability to pay for the medication [Doc. No. 16, pp. 12 - 13].[9] There is nothing

---

[8]This court's review of the record shows that the ALJ mis-identified the record reference; in her review of the medical evidence [Tr. 22], the ALJ correctly cited to the record as found at Exhibit 13, p. 14 or, for purposes of this appeal, Tr. 432.

[9]The ALJ's summary of Plaintiff's treatment at O.U. Medical Center contains three references to Plaintiff's non-compliance with medical advice [Tr. 23]. Of these three references by medical providers to Plaintiff's non-compliance [Tr. 420, 427, and 472], only the third incident – Plaintiff's decision to stop taking Procardia [Tr. 472] – was isolated by the ALJ in her credibility findings [Tr. 24]. Accordingly, that is the only reference discussed in this report. Plaintiff also refers [Doc. No. 16, p. 12] to the ALJ's discussion of an April, 2002, examination [Tr. 416] by Bryan L. Cain, D.P.M. and the fact that there is no indication from the record that Plaintiff ever returned to his office [Tr. 21]. Once again, however, the ALJ made no reference to this in her credibility findings [Tr. 24]. Moreover, Plaintiff's

10

in the record to suggest, however, that Plaintiff chose to discontinue Procardia for monetary reasons. Instead, the record reveals that Plaintiff simply stopped taking the medication that had been prescribed to treat her Raynaud's syndrome; she was subsequently instructed to restart it [Tr. 472] or, as Plaintiff described it in her testimony at the administrative hearing, "he made me go back on that." [Tr. 37]. There is no indication that Plaintiff's ability to pay for the medication was a factor. In fact, the record shows that Plaintiff did not run out of the Procardia but had it at her home [Tr. 472]. The record supports the ALJ's finding that Plaintiff did not follow medical advice in connection with the Procardia prescribed for Raynaud's syndrome. "[T]he ALJ properly considered what attempts Plaintiff made to relieve [her symptoms] – including whether [s]he took [prescribed] medication – in an effort to evaluate the veracity of plaintiff's contention that [her symptoms were] so severe as to be disabling." *Qualls v. Apfel,* 206 F.3d 1368, 1372 (10th Cir. 2000) (citations omitted).[10]

Next, Plaintiff sets out various limitations which she believes were established by her attorney's questioning of the medical expert at the administration hearing [Doc. No. 16, p. 13]. Contrary to Plaintiff's argument, however, the medical expert did not find that Plaintiff's impairments "further reduced her ability to finger and handle." *Id.* Rather, he

---

ability to obtain medical care in 2002 has no bearing on her situation during the period relevant to this claim.

[10]As the Commissioner correctly argues with regard to the authorities relied upon by Plaintiff in her briefing, "[t]he provisions Plaintiff cites solely address a situation in which a claimant has a presently-disabling impairment, but is denied benefits based upon the claimant's noncompliance with prescribed treatment that can restore the claimant's ability to work." [Doc. No. 17, pp. 6 - 7].

specifically advised the ALJ that Plaintiff's impairments resulted in no functional hand restrictions beyond avoiding cold temperature extremes and equipment that causes hand vibrations [Tr. 46 - 47 and 49] and, in response to questioning by Plaintiff's attorney, the expert testified that he was not inclined to associate Plaintiff's alleged symptoms with Raynaud's or angioedema [Tr. 52].[11] By the same token, the medical expert did not, as Plaintiff claims [Doc. No. 16, p. 13], state that Plaintiff's obesity[12] limited her ability to stand and walk. Instead, the expert testified that a generic, overweight individual could ease the discomfort of osteoarthritis through weight loss [Tr. 54]. Finally, Plaintiff maintains that her "treating podiatrist's extensive examination . . . confirmed her prior surgery and her current continued problems with walking, standing, and pain with respect to both of her feet (Tr. 417)." [Doc. No. 16, p. 13]. As the Commissioner observes, the record cited by Plaintiff was generated by the office of a urologist, not a podiatrist [Tr. 417]. Moreover, the report Plaintiff presumably intended to cite relates to an examination performed in April, 2002, more than four years prior to Plaintiff's alleged onset date [Tr. 416]. When asked about this report at Plaintiff's administrative hearing, the medical expert observed that Plaintiff's April,

---

[11]The only reference by Plaintiff in support of this particular argument was to page 52 of the transcript [Doc. No. 16, p. 13]. Because it is not this court's job to comb through the record to find support for Plaintiff's arguments, the medical expert's testimony on this particular page is the only evidence which has been considered. *See Effinger v.Callahan*, No. 97-7001, 1997 WL 446724, at *2 (10th Cir. Aug. 6, 1997) (unpublished op.) (the court will not comb through the record where counsel has not provided specific references tied to an argument) (citing *SEC v. Thomas*, 965 F.2d 825, 827 (10th Cir. 1992)).

[12]As is addressed in a separate section of this report, Plaintiff has not established that she was obese during the relevant period.

2007 consultative examination [Tr. 331 - 337] revealed that Plaintiff was able to walk without an artificial device; had a normal, safe and stable gait; could heel walk normally; her toe walk was weak, had normal straight leg raising tests bilaterally; and, had normal range of motion in both ankles [Tr. 53]. In other words, according to the medical expert, the consultative "exam does not really describe significant problems with the feet." *Id.*

To summarize, nothing cited by Plaintiff in connection with the testimony of the medical expert [Doc. No. 16, p. 13] casts doubt as to the evidentiary or legal basis of the ALJ's credibility analysis. Likewise, nothing in Plaintiff's conclusory statements – the ALJ has a duty to evaluate the impact of Plaintiff's symptoms on her ability to perform basic work activities; the entire record must be considered and boilerplate is not permitted; the ALJ must give specific reasons for her credibility decision in order to permit a meaningful review, *id.* at 14 – erodes either the legal or evidentiary foundation of the credibility findings.

The ALJ's conclusion – that Plaintiff's subjective complaints are not entirely credible – is well supported by substantial evidence.[13] An ALJ's "[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Kepler v. Chater,* 68 F.3d 387, 391 (10th Cir. 1995) (quotation omitted). The ALJ properly and sufficiently explained the required link between the evidence of record and her finding that Plaintiff's allegations were not entirely credible. And, "so long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility,"

---

[13]With the exception of her argument as to Plaintiff's decision to stop taking Procardia, Plaintiff has not challenged the ALJ's specific credibility findings [Tr. 24].

*Qualls,* 206 F.3d at 1372, "a formalistic factor-by-factor recitation of the evidence" is not required in the Tenth Circuit. *Id.* Plaintiff has failed to establish that the ALJ committed any error in connection with her assessment of Plaintiff's credibility.

### **RFC and *Trimiar* Factors**[14]

Plaintiff's next argument is that "[t]he ALJ failed to follow the mandate of SSR 96-8p and 20 C.F.R. §§ 404.1545 and 416.945 when determining the RFC for [Plaintiff]." [Doc. No. 16, p. 15]. Nonetheless, and as the Commissioner aptly responds,

> [a]lthough Plaintiff generally alleges that the ALJ erred in determining Plaintiff's RFC, Plaintiff fails to explain how she contends that the ALJ erred, and Plaintiff fails to identify any evidence she alleges the ALJ did not consider or any additional limitations that she alleges the ALJ should have included in her RFC assessment. Pl.'s Br. at 15 - 19. Although Plaintiff briefly references the medical expert's testimony regarding Plaintiff's limitations, the ALJ included the limitations the medical expert identified in her RFC finding, and Plaintiff does not assert otherwise (Tr. 24, 46). Pl.'s Br. at 15 - 16. Further although Plaintiff provides a detailed review of the [Vocational Expert's ("VE's")] hearing testimony, she appears to challenge only the VE's testimony that a hypothetical individual with Plaintiff's RFC and vocational profile would be able to perform the job of school bus monitor (Tr. 73). Pl.'s Br. at 16 - 18. Notably, Plaintiff does not challenge the VE's testimony that such an individual would also be able to perform the jobs of surveillance monitor and information clerk (Tr. 73).

[Doc. No. 17, p. 11].

The Commissioner is correct; Plaintiff's second claim of error focuses on the vocational evidence and her contention that the ALJ erred as a matter of law in relying on the VE's testimony that Plaintiff retained the capacity to perform the work of a school bus

---

[14]Plaintiff's second and third claims of error are considered together.

monitor [Doc. No. 16, pp. 15 - 19]. The Commissioner is also correct in arguing that Plaintiff does not contest[15] the ALJ's conclusion that she can work as a surveillance monitor and an information clerk [Tr. 27]. Thus, even assuming that error was committed in connection with the school bus monitor position, the only remaining issue relates to Plaintiff's third claim of error and whether "[t]he ALJ failed to apply the factors set out in *Trimiar v. Sullivan,* 966 F.2d 1326, 1130 (10th Cir. (Okla.) 1992) with respect to whether or not there was significant available jobs" when considering the surveillance monitor and information clerk positions [Doc. No. 16, p. 19]. *See Raymond v. Astrue,* 621 F.3d 1269, 1274 (10th Cir. 2009) (finding there was no need to consider a claimant's ability to perform a certain job where it was undisputed that he could perform another specific job; the only question is whether the other job exists in significant enough numbers).

As to Plaintiff's contention that the ALJ erred by failing to apply a multi-factor test described in the *Trimiar* decision, her theory is that the number of surveillance monitor and information clerk jobs available in Oklahoma – 151 and 315 respectively – is insufficient to meet the Commissioner's burden of establishing that there is other available work in significant enough numbers that Plaintiff could perform [Doc. No. 16, p. 19]. Nonetheless, and as the Commissioner argued in his response brief, "[t]he Tenth Circuit has explicitly stated that 'the controlling statutes, federal regulations, and case law all indicate that the

---

[15]Plaintiff made no such claim in her opening brief [Doc. No. 16] and, after the Commissioner affirmatively noted this concession through his response brief [Doc. No. 17, p. 11], she did not file a reply brief in order to counter the Commissioner's claim and, accordingly, has waived the issue.

proper focus generally must be on jobs in the national, not regional economy." [Doc. No. 17, p. 13, quoting *Raymond,* 621 F.3d at 1274]. There is no dispute between the parties that the evidence of record in this case establishes that there are 12,950 surveillance monitor jobs available in the national economy and 49,000 information clerk jobs [Doc. No. 16, p. 18; Doc. No. 17, p. 13]. And, despite the Commissioner's express contention – supported by relevant case law – that the issue is whether there is a legally significant number of jobs available nationally rather than locally, Plaintiff did not file a reply brief to either contest the Commissioner's legal argument or to "dispute that [61,950] jobs in the national economy is a legally 'significant' number." *Raymond,* 621 F.3d at 1274. Thus, Plaintiff has failed to establish error at step five of the sequential process.

**Obesity**

Here, Plaintiff contends that the ALJ erred by failing to consider Plaintiff's obesity in her formulation of Plaintiff's RFC [Doc. No. 16, p. 19]. Plaintiff contends that she is four feet, eleven inches tall and, citing to the record at pages 473 and 469, that her weight is between 149 and 151 pounds [Doc. No. 16, p. 20]. Thus, she concludes that her Body Mass Index ("BMI") ranges from 30.1 to 30.5 and meets one of the levels of obesity recognized by Social Security Ruling 02-1p, 2000 WL 628049. *Id.* The Commissioner counters, however, by explaining that Plaintiff is basing her argument on her weight *after* the expiration of the period relevant to this claim [Doc. No. 17, p. 14]. The Commissioner is correct; the weights cited by Plaintiff were both taken from treatment notes generated in 2008, after the expiration of her insured status on December 31, 2007. The Commissioner

16

then contends that "[u]sing the online BMI calculator Plaintiff cites in her brief, Plaintiff's weight between 134 and 138[16] pounds during the relevant period equated to a BMI between 27.1 and 27.9, well below the BMI of 30.0 required for obesity. SSR 02-01p." [Doc. No. 17, p. 14]. Once again, in the absence of any reply brief by Plaintiff with the citation of evidence in support of her claim – that is, evidence of record that her weight met a requisite level of obesity during the relevant period – this court concludes that Plaintiff's claim of error with regard to a claim of obesity is unavailing.

**Accurate Accounting**

In her final claim of error, Plaintiff relies [Doc. No. 16, pp. 21 - 22] on a provision of Social Security Ruling 96-9p, 1996 WL 374185, which provides that where, as here, a claimant has the RFC for less than a full range of sedentary work, "[a]n accurate accounting of an individual's abilities, limitations, and restrictions is necessary to determine the extent of erosion of the occupational base, the types of sedentary occupations an individual might still be able to do, and whether it will be necessary to make use of a vocational resource." *Id.* at *6.[17] In this regard, Plaintiff's sole argument is that "[t]he ALJ has failed to use the type of 'accurate accounting' required of SSR 96-9p." [Doc. No. 16, p. 22]. She does not explain, however, how the ALJ's decision falls short of the "accurate accounting" standard.

---

[16]The record reveals that Plaintiff weighed 138 pounds at the time of her April 24, 2007, consultative examination [Tr. 332].

[17]In this case, the ALJ relied upon a VE who, based upon the limitations described by the ALJ, identified jobs that Plaintiff was still able to perform [Tr. 27 and 68 - 74].

Plaintiff's failure to develop the factual – and legal – bases for her argument is sufficient to reject any unsupported claim. *See Threet v. Barnhart,* 353 F.3d 1185, 1190 (10th Cir. 2003) (finding appellate argument insufficiently developed and declining to speculate on appellant's behalf).

## **RECOMMENDATION AND NOTICE OF RIGHT TO OBJECT**

For the foregoing reasons, the undersigned recommends that the Commissioner's decision be affirmed. The parties are advised of their right to object to this Report and Recommendation by May 24, 2011, in accordance with 28 U.S.C. §636 and Fed. R. Civ. P. 72. The parties are further advised that failure to make timely objection to this Report and Recommendation waives their right to appellate review of both factual and legal issues contained herein. *Moore v. United States*, 950 F.2d 656 (10th Cir. 1991).

This Report and Recommendation disposes of all issues referred to the Magistrate Judge in this matter.

ENTERED this 4th day of May, 2011.

BANA ROBERTS
UNITED STATES MAGISTRATE JUDGE